# In the United States Court of Federal Claims

## No. 14-188 C

### (Filed August 1, 2014)[1]

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| CLINICOMP INTERNATIONAL, INC., | \* |
| | \*   Post-Award Bid Protest; |
| *Plaintiff*, | \*   Waiver of Plaintiff's |
| | \*   Challenge to the |
| v. | \*   Solicitation's Terms; |
| | \*   Disparate Treatment of |
| THE UNITED STATES, | \*   Offerors in Evaluation of |
| | \*   Quotations. |
| *Defendant*. | \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Richard J.R. Raleigh, Jr.*, Huntsville, AL, for plaintiff.  *Jerome S. Gabig, Jr.*, Huntsville, AL, of counsel.

*Michelle R. Musgrave*, United States Department of Justice, with whom were *Stuart F. Delery*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Patricia M. McCarthy*, Assistant Director, Washington, DC, for defendant.

---

## OPINION AND ORDER

---

**BUSH,** *Senior Judge*.

---

[1]/ This opinion was issued under seal on July 8, 2014.  Pursuant to ¶ 5 of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged.  Only plaintiff proposed redactions.  Brackets ([ ]) identify the redacted portions of this opinion.

This post-award bid protest arises out of Request for Quotations (RFQ) No. VA249-13-Q-1015, by which the United States Department of Veterans Affairs (VA) sought, by means of a lowest price technically acceptable procurement conducted pursuant to Federal Acquisition Regulation (FAR) 15.101-2,[2] to procure a computer information system for the intensive care units of various VA medical centers in Kentucky, Tennessee, and West Virginia.  CliniComp International, Inc. (CliniComp), an unsuccessful bidder for the solicitation, filed a post-award bid protest complaint on March 6, 2014 seeking declaratory and injunctive relief associated with the VA's contract award to Picis, Inc. (Picis).

The administrative record (AR) was originally filed under seal on March 12, 2014, and supplements to the AR were filed under seal on March 21, 2014 and April 18, 2014.[3]  Briefing was filed according to an expedited schedule and oral argument was held on June 10, 2014.

As discussed below, the VA's award decision was fundamentally flawed and must be enjoined.  Accordingly, plaintiff's motion for judgment on the administrative record is granted, and defendant's motion for judgment on the administrative record is denied.

## BACKGROUND[4]

---

[2]/  Unless otherwise specified, all citations in this opinion to the FAR are to the 2012 version of Title 48 of the Code of Federal Regulations.

[3]/  On March 18, 2014, plaintiff filed a motion to supplement the AR with a declaration prepared by William McDonald, Jr., CliniComp's controller, which plaintiff attached as Exhibit A to its complaint.  The government opposes plaintiff's motion to supplement.  On March 21, 2014 and April 17, 2014, the government filed unopposed motions to supplement the AR with several documents that had been inadvertently omitted from the AR.  *See* AR Tabs 6, 13-15, 15a, 16-17.  In orders dated March 21, 2014 and April 18, 2014, the court granted the government's unopposed motions to supplement but deferred ruling on plaintiff's motion to supplement, which the court addresses *infra*.

[4]/  In the following section, the court sets forth its findings of fact drawn from the AR and the parties' submissions.  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (stating that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court").

## I.      Request for Quotations

On September 17, 2013, the VA issued RFQ No. VA249-13-Q-1015 to procure a computer information system (CIS) for the intensive care units (ICUs) of seven VA medical centers located within the VA's Veteran Integrated Service Network 9 (VISN 9), which encompasses Kentucky, Tennessee, and West Virginia. AR Tab 1. The RFQ stated that the deadline for the submission of quotations was September 25, 2013, and described the period of performance under the awarded contract as beginning on September 27, 2013. *Id.* at 1, 5-16.

In the "Statement of Work" set forth in the RFQ, the procurement is described as seeking "a state of the art and fully integrated system" that will "employ advanced technological methods in the integration of healthcare data to improve patient quality of care, reduction of medical errors, and increase in cost savings" for the various VA medical centers within VISN 9. AR at 16. To that end, the Statement of Work emphasized that the delivery of a "complete turnkey project" meeting the "substantial interface requirements between the CIS, the [Veterans Health Administration] hospital information system (Vista) and other systems" was "a critical component of this project." *Id.* "Vista" is an acronym signifying the Veterans Health Information Systems and Technology Architecture, which is the Veterans Health Administration's (VHA's) hospital information system. *Id.* at 28.

With respect to the VA's need for a "fully integrated system," the Statement of Work elaborated that "[t]he CIS shall enable full integration of all systems including exchanging clinical data with the Vista systems of VISN [9]." AR at 17 (stating also that "[t]he integration with Vista provides for transfer of clinical data between the CIS and the Vista systems of the VISN"). The exchange of clinical data between the vendor-supplied CIS and the VA's Vista system was to be accomplished via "interfaces." *Id.* at 16 (stating that "[q]uotes shall provide the required interfaces as specified in their submitted timelines and as further defined herein for a complete turnkey project"), 95 (stating that "[t]he Contractor shall provide interfaces to solve the problem of electronic documentation, continuum of care, advance clinical access, and clinical workflow in critical care areas," and describing this requirement as a "key element" of the procurement). The VA-

provided, or "Vista-side," interfaces were to be furnished by Document Storage Systems (DSS), a third-party contractor, while the successful offeror was to furnish vendor-side interfaces capable of "exchang[ing] data bi-directionally between Vist[a]/CPRS and CIS applications."[5] *Id.* at 95; *see also id.* at 17 (stating that "[t]he VISN shall implement the Vista side of the interfaces under a separate contract using the DSS DataBridge interface"), 95 (stating that "[t]he Government will furnish the appropriate interfaces to operate on the Vist[a] systems" and "[t]he successful Contractor will be responsible to provide the other half[] (the vendor-side) as part of this contract").[6]

In the portion of the RFQ titled "Evaluation Criteria," the VA stated that it would award a firm fixed price task order to the contractor representing the best value. AR at 65. The agency's determination of best value, and hence its award, was to be based on the lowest priced technically acceptable quotation.[7] *Id.* The evaluation criteria to be utilized by the VA in assessing the technical acceptability of proposals were as follows:

> The contractor's understanding of the VA's requirement for a robust, scalable, integrated solution; and its present capacity to implement its enterprise solution in VISN 9[;]

---

[5] The RFQ defined "CPRS," or Computerized Patient Record System, as "a graphical user interface (GUI) to display Vista patient information." AR at 27.

[6] The RFQ set forth, in separate attachments, the specifications for the "Vista-side" interfaces to be furnished by DSS. AR at 135-50 (RFQ Attachments F and G); *see id.* at 17 (stating that the "DSS DataBridge interface specifications are at Attachments F and G").

[7] A lowest price technically acceptable source selection process is appropriate when best value is expected to result from selection of the technically acceptable proposal with the lowest evaluated price. FAR 15.101-2(a). In this source selection process, "[p]roposals are evaluated for acceptability but [are] not ranked using the non-cost/price factors." *Id.* 15.101-2(b)(3). In other words, in a lowest price technically acceptable procurement, there is no best value tradeoff. *Id.* 15.101-2(b)(2) (stating that "[t]radeoffs are not permitted"). Award is instead made to the offeror with the lowest evaluated price whose proposal meets or exceeds the non-price acceptability standards articulated in the solicitation. *Id.* 15.101-2(b)(1).

> The contractor's understanding of the Government's Protected/Patient Health Information (PHI) and security requirements and its capacity to implement and support the same and its record of compliance respecting HISD, HSPD-12, NIST, and FIPS requirements[;]
>
> The license offered to VISN 9[;]
>
> The warranty offered to VISN 9[;] [and]
>
> [T]he Contractor's identification of schedule and performance risk[] and its concept and capacity to mitigate risk and recover from adverse events.

*Id.* at 65-66. The evaluation of each proposal's technical acceptability was to be conducted "on a pass/fail basis," and proposals failing to achieve a "pass rating" with respect to each technical criterion were to be considered unacceptable and therefore ineligible for award. *Id.* at 65. To achieve a "pass rating," offerors were required to "adequately address all technical requirements contained in the [Statement of Work] and in the Attachments" to the RFQ. *Id.*

Attachment D to the RFQ – titled "System Specifications" – contained a table of mandatory technical requirements for proposals.[8] AR at 87-108; *see also id.* at 27 (stating that the technical components listed in Attachment D shall be provided by the contractor). Of particular importance to this dispute, requirement 5.7.3, which was located under a sub-category titled "[d]isplay and store waveforms from patient monitors," stated as follows:

> Vendor shall demonstrate product will receive and import digital images of waveforms as well as document all wave forms produced by both the physiological patient monitor and the peripheral devices used in VISN 9. Wave forms shall be recorded

---

[8]/ Attachment D also included a list of non-mandatory "Desirable Elements." AR at 109-24.

5

> not only as data points but also as a viewable wave
> form. *The viewable wave forms are to be saved in
> CPRS as part of the patient record.*

*Id.* at 108 (emphasis added).  It is the italicized sentence above that has engendered the present dispute.

In addition, and of relevance to the dispute at hand, the RFQ stated that "[t]he Government intends to evaluate offers and award a contract without discussions with offerors," and therefore "the offeror's initial offer should contain the offeror's best terms from a price and technical standpoint."  AR at 63; *see also id.* at 929 (Acquisition Plan, dated August 20, 2013, indicating that the VA did not intend to conduct discussions and did not contemplate proposal revisions).  However, the government "reserve[d] the right to conduct discussions if later determined by the Contracting Officer to be necessary."  *Id.* at 63.

## II.    Submission and Evaluation of Quotations

From September 18, 2013 through the close of bidding on September 25, 2013, William McDonald, Jr., CliniComp's controller, engaged in e-mail correspondence with Sean Hendricks, the contracting officer, regarding CliniComp's questions about various technical requirements set forth in the RFQ.  AR at 396-408; *see also id.* Tabs 2-4 (e-mail attachments containing CliniComp's questions and the VA's answers).  None of Mr. McDonald's questions during this period pertained to requirement 5.7.3.

On September 25, 2013, two offerors – CliniComp and Picis – submitted timely quotations in response to RFQ No. VA249-13-Q-1015.  AR Tabs 6-7.  CliniComp's quoted price, which "reflect[ed] . . . a [ ] percent discount from CliniComp's [General Services Administration (GSA)] Schedule Pricelist," was [ ] for one base year and four option years.  *Id.* at 416, 431.  In contrast, Picis's quoted price for the same contract term was $4,651,415.30, which was consistent with Picis's "regular GSA prices."  *Id.* at 529, 791.

In response to requirement 5.7.3 in Attachment D to the RFQ, CliniComp's proposal stated:

> Yes.  Waveforms from bedside devices are streamed continuously to [CliniComp] data acquistion equipment. This data subsequently can be saved permanently on the CIS.  *If the VA wishes to redundantly export waveform data to CPRS, a quotation could be provided.  The quotation would require mutually agreed upon specifications.*

AR at 527.26 (emphasis added).  Picis's quotation provided the following response to requirement 5.7.3:

> Waveform images and other digital images like outside labs, consents, etc[.] can be included in the Picis workflow through an inbound HL7 documentation interface.  This interface allows documents and document images to be directly launched from Picis Critical Care Manager in their originating application (.doc file in Word, .pdf files in Adobe, etc[.]).

*Id.* at 590.

On September 26, 2013, the VA's Mr. Hendricks contacted Mr. McDonald seeking additional information regarding CliniComp's response to requirement 5.7.3.  AR at 939-40.  Specifically, Mr. Hendricks inquired as to why CliniComp failed to include in its base price the cost of saving wave form data in CPRS, and instead offered to provide an additional quotation for that service:

> In the Mandatory Requirements, Question 5.7.3, [CliniComp's] response says "If the VA wishes to redundantly export waveform data to CPRS, a quotation could be provided.  The quotation would require mutually agreed upon specifications."  VISN 9 doesn't understand why [CliniComp] would provide a[n] [additional] quotation for something that is a mandatory requirement.  Shouldn't it just be included in the base price?

*Id.* at 939.

Later that same day, Mr. McDonald provided the following response by e-mail:

> Waveforms are charted and stored on the CliniComp[]
> CIS as a part of the official patient record.  If the VA
> requires the patient record, including "viewable
> waveforms[,]" to be sent to the CPRS, then DSS is the
> only currently approved methodology to do so.  DSS
> does not presently support an interface to receive
> "viewable waveforms" contained in the patient record.  If
> VISN 9 arranges for DSS to provide any interface, based
> on mutually agreeable standard technical specifications,
> then CliniComp[] will provide for sending the waveforms
> in the patient records to DSS for transmittal to CPRS.
> This interface would be made available at no additional
> cost to the VISN.  Alternatively, CliniComp[] could
> develop an interface directly to CPRS if authorized by
> the VA.  This was the alter[n]ative being addressed in
> CliniComp['s] original response.  This would require
> mutually agreed upon specifications and a quotation for
> additional costs, depending on the specifications.  For
> example, CliniComp[] could provide, at no charge, the
> ability to export "viewable waveforms" as PDFs.  Again,
> this is assuming that VA approves a direct interface to
> receive PDFs.

AR at 940.  Mr. Hendricks responded by e-mail shortly thereafter, indicating that
the VA's evaluation panel had reviewed Mr. McDonald's clarifying e-mail and felt
it "ha[d] sufficient information" to assess the technical acceptability of
CliniComp's proposal.  *Id.* at 938.

Based upon CliniComp's response to requirement 5.7.3 in its quotation, as
well as the additional information provided by Mr. McDonald on September 26,

2013, the VA's evaluators unanimously rated CliniComp's proposal as technically unacceptable because CliniComp did not provide a quote for saving wave form data in CPRS and stated that such a quote "would require mutually agreed upon specifications."  AR at 527.26; *see id.* Tab 8 (technical evaluation of CliniComp's quotation).  On September 27, 2013, Mr. Hendricks notified Mr. McDonald of the results of the VA's technical evaluation.  *Id.* at 947 (stating that CliniComp's quotation "was rated Technically Unacceptable because [CliniComp's] responses in section 5.7.3 . . . did not meet the mandatory requirements provided in section D of the RFQ"); *see also id.* at 937-38.  Mr. Hendricks explained that the VA "will not consider any further quote revisions" and would award the contract to Picis "for the aggregate price of $4,651,415.30" based upon the VA's determination that Picis had submitted a technically acceptable proposal with the lowest evaluated price.  *Id.* at 947; *see also id.* Tab 16 (technical evaluation of Picis's quotation).

By e-mail to Mr. Hendricks on September 29, 2013, Mr. McDonald requested a post-award debriefing pursuant to FAR 15.506 to determine the basis for the VA's rating of CliniComp's proposal as technically unacceptable.  AR at 937.  On October 3, 2013, one day after the VA entered into Contract No. GS-35F-0589X with Picis, *see id.* Tab 9, Mr. Hendricks responded by e-mail that CliniComp's quotation "fail[ed] to comply with . . . requirement [5.7.3]" because it "offer[ed] another obstacle to address and more money and possible negotiations that would have to take place in order for compliance to occur," *id.* at 933.

## III.   CliniComp's Protests

### A.   Protest before the VA

On October 7, 2013, CliniComp filed an agency-level protest with the VA in which it asserted that the agency erred in rejecting CliniComp's quotation as technically unacceptable.  AR Tab 10.  Among the grounds for CliniComp's agency-level protest was its contention that requirement 5.7.3 "is contrary to the nationally mandated means authorized for ICU CIS interfaces to Vista/CPRS."  *Id.* at 894.  CliniComp specifically challenged the portion of requirement 5.7.3 which specified that "viewable wave forms are to be saved in CPRS as part of the patient record."  *Id.* at 108; *see id.* at 895 (stating that "[n]o clinical data [are] actually stored or saved in the CPRS GUI"), 904 (asserting that "[requirement] 5.7.3 is

problematic in that VISN 9 was . . . seeking an interface other than DSS which: (1) did not exist[;] and (2) was not authorized for VISN 9 to use"), 906 (claiming that requirement 5.7.3 "is seeking a direct access to Vist[a] other than the DSS Data Bridge," which the VA "lacked authority to require").  In support of its challenge to requirement 5.7.3, CliniComp submitted a declaration prepared by Dr. Douglas E. Rosendale, a board-certified general surgeon and advisor to the VHA's Office of Health Information, in which Dr. Rosendale opined that requirement 5.7.3 "is technically incorrect in requiring that '[t]he viewable wave forms are to be saved in CPRS as part of the patient record.'"  *Id.* at 913 (stating that "CPRS is a user interface to Vist[a]," and that "[a]s one would expect of a GUI, no permanent data about a patient is stored or saved directly to CPRS per se, but rather the GUI provides the user means for viewing the patient data in Vist[a]").

In addition to CliniComp's challenge to the language of requirement 5.7.3, CliniComp alleged that "the manner in which VISN 9 communicated with CliniComp on September 26 was inadequate because CliniComp was misle[]d into responding in a way that did not address the VISN 9 evaluator's concerns."  AR at 904.  In support of that allegation, CliniComp submitted a declaration prepared by Mr. McDonald in which he described his correspondence with Mr. Hendricks.  *Id.* at 908-11.

The VA denied CliniComp's protest on January 24, 2014.  AR Tab 12.  In its written decision, the VA concluded that, as an initial matter, CliniComp's challenge to requirement 5.7.3 was untimely because, pursuant to FAR 33.103(e), any objection to the terms of the RFQ had to be made "before bid opening or the closing date for receipt of proposals."  *Id.* at 919 (citing FAR 33.103(e) (2013)).  The VA also found that CliniComp's response to requirement 5.7.3, as well as Mr. McDonald's clarification via e-mail on September 26, 2013, "clearly took exception to the Agency's requirement, thereby rendering CliniComp's quote/proposal technically unacceptable."  *Id.* at 920.  Furthermore, the VA rejected CliniComp's assertion that it was misled in exchanges with the VA, concluding that such allegations were not substantiated.  *Id.*  Finally, the VA rejected CliniComp's argument that it was prejudiced by the agency's alleged errors.  *Id.*  In that regard, the agency found it impossible to determine if CliniComp in fact offered the lowest price as compared to Picis because

CliniComp's response to requirement 5.7.3 contemplated an additional, subsequent quotation for saving wave form data in CPRS.  *Id.*

## B.     Protest in This Court

CliniComp filed its bid protest complaint in this court on March 6, 2014.  In its seven-count complaint, CliniComp alleges that:  (1) the VA's determination that CliniComp's proposal was technically unacceptable was arbitrary, capricious, and an abuse of discretion, Compl. ¶¶ 33-36 (Count I); (2) the VA violated the Competition in Contracting Act of 1984 (CICA), 41 U.S.C. § 3301 (2012), by creating a competitive range of one offeror, *id.* ¶¶ 37-41 (Count II); (3) the VA failed to engage in meaningful discussions with CliniComp, *id.* ¶¶ 42-49 (Count III); (4) the VA abused its discretion by "abruptly and prematurely terminat[ing] discussions" with CliniComp, *id.* ¶¶ 50-57 (Count IV); and (5) the VA unlawfully engaged in unequal treatment by "relaxing the requirement that wave forms are to be saved to the CPRS GUI" when evaluating the quotation submitted by Picis, *id.* ¶ 62; *see* ¶¶ 58-63 (Count V).  Based on these allegations of error, CliniComp seeks declaratory relief, *id.* ¶¶ 64-69 (Count VI), as well as permanent injunctive relief, *id.* ¶¶ 70-75 (Count VII).[9]

## DISCUSSION

## I.     Jurisdiction

This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1) (2012).  This jurisdictional grant is "without regard to whether suit is instituted before or after the contract is

---

[9]/ CliniComp's complaint also seeks preliminary injunctive relief, *see* Compl. ¶¶ 70-75, and CliniComp filed a corresponding Motion for Preliminary Injunction on March 6, 2014.  On March 10, 2014, the court denied plaintiff's request for preliminary injunctive relief as moot because the government, during a telephonic status conference on March 7, 2014, agreed to suspend contract performance until after a resolution of CliniComp's bid protest.  *See* Order of March 10, 2014, at 2.

awarded." *Id.*  As a threshold jurisdictional matter, however, the plaintiff in a bid protest must show that it has standing to bring its suit.  *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (*ITAC*); *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002).  The court addresses CliniComp's standing to pursue it protest *infra*.

## II.     Standards of Review

### A.     Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) provides for judgment on the administrative record.  In reviewing a motion or cross-motions under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005).  The court must make factual findings where necessary.  *Id.*  The resolution of RCFC 52.1(c) cross-motions is akin to an expedited trial on the paper record.  *Id.*

### B.     Bid Protest Review

The court first examines, as a threshold jurisdictional matter, whether the plaintiff in a bid protest has standing to bring the suit.  *ITAC*, 316 F.3d at 1319.  Bid protest standing is limited to those plaintiffs who are actual or prospective bidders and whose direct economic interest would be affected by the award of the contract or by the failure to award the contract.  *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013).  To establish a direct economic interest in a post-award bid protest, an actual or prospective bidder must show that there was a substantial chance it would have received the contract award but for the alleged errors in the procurement process.  *Id.* (citing *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006)); *see also ITAC*, 316 F.3d at 1319.

Upon determining that a plaintiff has standing to sue, the court next considers the merits of the bid protest.  A bid protest proceeds in two steps, with the trial court first determining whether the government acted without a rational basis or contrary to law.  *Bannum*, 404 F.3d at 1351.  If the award decision fails

review, the court then determines as a factual matter whether the plaintiff was prejudiced by the arbitrary or unlawful conduct.  *Id.*

The standard of review for a bid protest brought pursuant to section 1491(b) is whether the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law (the APA standard).  28 U.S.C. § 1491(b)(4) (incorporating the APA standard set forth in 5 U.S.C. § 706 (2012)); *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)).  Under the APA standard, a procurement decision may be set aside if it lacks a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute or regulation.  *Banknote*, 365 F.3d at 1351.  "A court evaluating a challenge on the first ground must determine 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'"  *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001)).

The APA standard is "highly deferential."  *Advanced Data Concepts*, 216 F.3d at 1058.  Under this standard, *de minimis* errors in the procurement process do not justify relief.  *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing *Andersen Consulting v. United States*, 959 F.2d 929, 932-33, 935 (Fed. Cir. 1992)).  A bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question.  *Id.*

A protester's burden is "greater in negotiated procurement, as here, than in other types of bid protests because 'the contracting officer is entrusted with a relatively high degree of discretion.'"  *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907-08 (Fed. Cir. 2013) (quoting *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004)); *see also Burroughs Corp. v. United States*, 617 F.2d 590, 598 (Ct. Cl. 1980) (stating that negotiated procurements give a "breadth of discretion" to the contracting officer, and impose a heavier burden of proof on a protester (citing *Keco Indus., Inc. v. United States*, 492 F.2d 1200, 1204 (Ct. Cl. 1974))).  Moreover, where, as here, a protester challenges the contracting officer's determination regarding the technical acceptability of proposals, the protester bears an "'unusually heavy burden of proof

in showing that the determination . . . was arbitrary and capricious.'"  *Westech Int'l, Inc. v. United States*, 79 Fed. Cl. 272, 286 (2007) (quoting *Cont'l Bus. Enters. v. United States*, 452 F.2d 1016, 1021 (Ct. Cl. 1971)); *see Omega World Travel, Inc. v. United States*, 54 Fed. Cl. 570, 578 (2002) ("It is well settled that contracting officers are given broad discretion with respect to evaluation of technical proposals." (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996))).

"'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'"  *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).  If, on the other hand, the protester has shown a significant error in the procurement process, the court must determine as a factual matter whether that error prejudiced the protester, because both error and prejudice are required for the protester to prevail.  *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) (citing *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (*Data General*)).

A bid protest plaintiff bears the burden of establishing prejudice.  *Bannum*, 404 F.3d at 1358.  To meets its burden, a protester must show that there was a substantial chance it would have received the contract but for the agency's errors.  *Id.*; *see also Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999).  Thus, in this bid protest, the substantial chance standard must be applied twice:  first, to determine CliniComp's standing to bring its suit; and, second, to determine whether CliniComp suffered prejudice as a result of any adjudged errors in the procurement process.  *See, e.g.*, *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 695-96 (2010) (differentiating between "allegational prejudice" and "APA prejudice," both of which apply the substantial chance test).

## III.   Standing

Although the government has not directly challenged CliniComp's standing, standing is a threshold inquiry that the court must address before considering the

merits of CliniComp's protest.  *ITAC*, 316 F.3d at 1319.  As previously stated, to establish standing, CliniComp must show that it is an actual or prospective bidder whose direct economic interest is affected by the award of the contract – *i.e.*, that CliniComp is an interested party prejudiced by the award to Picis.  *Id.*  To establish prejudice, and therefore standing, CliniComp must show that there was a substantial chance it would have received the contract award but for the alleged errors in the procurement process.  *Orion*, 704 F.3d at 1348; *ITAC*, 316 F.3d at 1319.

CliniComp does not address the issues of standing or prejudice in its opening brief.  Nevertheless, in its reply brief, plaintiff asserts that "[s]ince [CliniComp] submitted the lowest price proposal, there was a substantial chance that it would have won the contract award but for the procurement errors of the agency."  Pl.'s Reply at 22.

The government, while not directly challenging CliniComp's standing to bring its protest, lodges an implicit challenge to CliniComp's standing by alluding to the VA's conclusion, in its denial of CliniComp's agency-level protest, that it was "impossible to determine if CliniComp in fact offered the lowest price" as compared to Picis because CliniComp's response to requirement 5.7.3 contemplated an additional, subsequent quotation for saving wave form data in CPRS.  *See* Def.'s Mot. at 23 (citing AR at 920).  Defendant's, as well as the agency's, analysis in that regard manifests a misunderstanding of a protester's burden to establish prejudice.  It is true that to satisfy the substantial chance test, a protester "must demonstrate more than a 'mere possibility that [it] would have received the contract but for the [alleged] error [in the procurement process].'"  *Asia Pac. Airlines v. United States*, 68 Fed. Cl. 8, 18 (2005) (quoting *Data General*, 78 F.3d at 1562), *appeals dismissed per stipulation*, 175 F. App'x 346 (Fed. Cir. 2006), 171 F. App'x 837 (Fed. Cir. 2006).  However, "a protester is not required to show that but for the alleged error, [it] would have been awarded the contract."  *Data General*, 78 F.3d at 1562; *see Dynacs Eng'g Co. v. United States*, 48 Fed. Cl. 614, 619 (2001) (rejecting a "narrow" interpretation of the substantial chance test that would "require[] a protestor to show substantial *certainty* that it would have received the contract but for the error" (citing *Alfa Laval*, 175 F.3d at 1368)).

Here, the allegations contained in CliniComp's complaint, when accepted as true, demonstrate more than a "mere possibility" that CliniComp would have been awarded the disputed contract but for the alleged errors in the procurement process. Specifically, CliniComp alleges that Picis, the only other offeror, submitted a quotation offering a price that exceeded CliniComp's by more than [ ].  Compl. ¶ 8.  That allegation is supported by the record.  *See* AR at 431, 791.  CliniComp therefore has demonstrated a substantial chance that, but for the alleged flaws in the procurement at issue, which resulted in CliniComp's quotation being rejected as technically unacceptable, CliniComp would have received award as the lowest price technically acceptable offeror.

## IV.   Analysis of the Merits

Plaintiff's seven-count complaint distills down to three alleged improprieties:  (1) that the VA's evaluation of the technical elements of CliniComp's and Picis's quotations was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law (Counts I and V); (2) that the VA's rejection of CliniComp's quotation as technically unacceptable improperly resulted in a "competitive range" consisting of one offeror (Count II); and (3) that the VA failed to engage in adequate "discussions" with CliniComp following the deadline for the submission of quotations and before award (Counts III and IV). The court will address each alleged impropriety in turn.

### A.   Plaintiff's Challenges to the VA's Technical Evaluation of Proposals

Plaintiff's initial allegation of error challenges the VA's technical evaluation of proposals submitted by CliniComp and Picis.  *See* Compl. ¶¶ 33-36, 58-63; Pl.'s Mot. at 14-23, 31-34, 37; Pl.'s Reply at 6-16, 22, 29.  Plaintiff's arguments in this regard are two-fold.  First, plaintiff asserts that the VA's determination that CliniComp's quotation took exception to requirement 5.7.3 was arbitrary, capricious, and an abuse of discretion because that determination "rest[ed] on" the agency's allegedly "flaw[ed]" interpretation of the term CPRS in requirement 5.7.3.  Pl.'s Mot. at 15; *see also id.* at 16-23; Pl.'s Reply at 8-12.  Second, plaintiff contends that the agency engaged in disparate treatment by rating Picis's quotation as technically acceptable despite the fact that Picis, in its quotation, did not commit

to saving viewable wave forms "in CPRS as part of the patient record."  Pl.'s
Mot. at 31-34; Pl.'s Reply at 13-14.

### 1.    Untimely Challenge to the Terms of the Solicitation

Plaintiff's first challenge to the VA's technical evaluation is its argument
that the evaluation of CliniComp's quotation was based upon the agency's
improper interpretation of the term CPRS in requirement 5.7.3.  *See* Pl.'s Mot. at
15-17; Pl.'s Reply at 8-12.  As previously noted, requirement 5.7.3 stated that
"viewable wave forms are to be saved in CPRS as part of the patient record," AR
at 108, and the RFQ elsewhere defined the term CPRS as "a graphical user
interface (GUI) to display Vista patient information," *id.* at 27.

In CliniComp's view, it "is simply impossible" for wave form data to be
saved in a GUI.  Pl.'s Mot. at 23.  Thus, plaintiff contends, "although supported by
the solicitation's definition of CPRS, the [VA's] literal interpretation [of CPRS to
mean a GUI] is nonsensical."  *Id.*; *see also id.* at 15 (asserting that "it is
nonsensical that data can be saved to a GUI").  The only reasonable meaning of the
term CPRS, according to plaintiff, is "a system of patient records that is capable of
displaying 'Vista patient information.'"  Pl.'s Mot. at 17; Pl.'s Reply at 8-12.  In
the alternative, CliniComp suggests that the RFQ is latently ambiguous as to the
meaning of CPRS.[10]  *See* Pl.'s Reply at 12-13.

The government argues that plaintiff's challenge to the VA's alleged
understanding of the term CPRS constitutes an untimely challenge to the terms of
the RFQ and is thus waived under *Blue & Gold Fleet, LP v. United States*, 492
F.3d 1308 (Fed. Cir. 2007).  *See* Def.'s Mot. at 9-13; Def.'s Reply at 3-7.  In that
regard, defendant contends that plaintiff's challenge is not directed at the
government's interpretation of the term CPRS but, rather, to the solicitation itself,
which defines CPRS to mean a GUI.  *See* Def.'s Mot. at 9-10.  Because CliniComp

---

[10]/  At oral argument, plaintiff "concede[d]" ambiguity in the term CPRS but contended
that such ambiguity was latent, not patent.  Tr. at 19.  CliniComp's concession in that regard
appears to be at odds with its assertion, oft-repeated in its briefs and at oral argument, that its
interpretation of CPRS is the only reasonable one.  *See* Pl.'s Mot. at 17-23; Pl.'s Reply at 8-12;
Tr. at 14, 19-20.

did not object to the solicitation's definition of CPRS before submitting its quotation, the government argues that CliniComp has waived its right to do so before this court. *See id.* at 10-13.

As set forth below, the court agrees with the government that plaintiff's objection to the VA's alleged interpretation of the term CPRS in requirement 5.7.3 amounts to an allegation of patent error or ambiguity in the RFQ itself. Because CliniComp failed to raise this objection with the VA before the close of the bidding process, it has waived its right to do so in the instant protest. *See Blue & Gold Fleet*, 492 F.3d at 1314-15.

In *Blue & Gold Fleet*, the United States Court of Appeals for the Federal Circuit held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims." 492 F.3d at 1315. Citing the desire to prevent contractors "from taking advantage of the government and other bidders" and to "avoid[] costly after-the-fact litigation," the Federal Circuit in *Blue & Gold Fleet* stated that "'[v]endors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award.'" *Id.* at 1314 (quoting *Argencord Mach. & Equip., Inc. v. United States*, 68 Fed. Cl. 167, 175 n.14 (2005)); *see also Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1362-63 (Fed. Cir. 2009). The Federal Circuit grounded this waiver rule in the statutory mandate for reviewing courts to "'give due regard to . . . the need for expeditious resolution'" of procurement disputes pursued under 28 U.S.C. § 1491(b). *Blue & Gold Fleet*, 492 F.3d at 1315 (quoting 28 U.S.C. § 1491(b)(3)). The rule in *Blue and Gold Fleet* thus bars a protester from raising objections to patent errors or ambiguities in the terms of a solicitation after the closing of bidding if such errors or ambiguities were apparent on the face of the solicitation. Our court has consistently applied this equitable bar as part of the court's bid protest review. *See, e.g.*, *Eco Tour Adventures, Inc. v. United States*, 114 Fed. Cl. 6, 26 (2013); *Linc*, 96 Fed. Cl. at 697-98 (citing cases).

As an initial matter, the court finds that plaintiff's objections to the VA's alleged interpretation of the term CPRS constitute allegations of patent error or ambiguity in the terms of the solicitation itself. Interpretation of a government

solicitation, as with a contract, begins with the solicitation's plain language. *See, e.g.*, *Banknote*, 365 F.3d at 1353 (citing *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (*Coast Federal Bank*)).  "If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning; we may not resort to extrinsic evidence to interpret them."  *Id.* (citing *Coast Federal Bank*, 323 F.3d at 1038).  In discerning a solicitation's plain meaning, the court "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions."  *Id.* (citing *Coast Federal Bank*, 323 F.3d at 1038).  An interpretation that gives a reasonable meaning to all provisions of a solicitation is therefore to be preferred over one that leaves a portion of the solicitation meaningless or superfluous.  *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (*NVT Technologies*) (citing *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)).

Here, the solicitation clearly defined the Computerized Patient Record System, or CPRS, as "a graphical user interface (GUI) to display Vista patient information," AR at 27, and stated in no uncertain terms that "viewable wave forms are to be saved in CPRS as part of the patient record," *id.* at 108.  Contrary to plaintiff's assertions, the court finds this language to be reasonably susceptible to only one interpretation:  that the VA required offerors to demonstrate their ability to save viewable wave forms in a GUI, namely CPRS.

In attempting to demonstrate the reasonableness of its interpretation of the term CPRS, plaintiff ignores the solicitation's plain language and instead relies upon a strained reading of other portions of the RFQ which allegedly establish that CPRS refers only to a "system of patient records," to the exclusion of a GUI.  Pl.'s Mot. at 18 (stating that CPRS is "a generic term that means a system of patient records, rather than a GUI"), 37; Pl.'s Reply at 10-11.  For instance, CliniComp cites several portions of the solicitation where the term CPRS is referenced together with the term "Vista," and posits that the juxtaposition of these terms (*i.e.*, "Vista/CPRS") establishes that CPRS must refer only to a "system of patient records" and cannot also mean a GUI.  Pl.'s Mot. at 18-19 (citing AR at 88-89, 95); *see also id.* at 21 (asserting that the solicitation "acknowledges CPRS and Vista being intertwined" (citing AR at 28)).  Yet plaintiff fails to explain how the

portions of the RFQ it cites support its argument that CPRS means something other than what the solicitation says it means.

Plaintiff's argument simply ignores the well-settled legal principle that interpretations which give effect to all of a solicitation's provisions are preferred over interpretations which render a portion of the solicitation meaningless. *See NVT Technologies*, 370 F.3d at 1159; *Banknote*, 365 F.3d at 1353. For the court to accept plaintiff's interpretation of the term CPRS would be to ignore, and render a nullity, the clear language of the RFQ defining CPRS as "a graphical user interface (GUI) to display Vista patient information." AR at 27. Such a result would violate well-settled legal principles governing the interpretation of solicitations.

Equally unpersuasive is plaintiff's reliance upon extrinsic evidence to support its understanding of the term CPRS. Specifically, plaintiff asserts that Dr. Rosendale's declaration submitted in support of CliniComp's agency-level protest, as well as Internet articles from *Wikipedia* and *PC Magazine*, establish that the solicitation's definition of CPRS is "nonsensical." Pl.'s Mot. at 15-16. In addition, plaintiff cites to various portions of Picis's quotation to demonstrate that the term CPRS has a "trade usage that means a system of patient medical records." *Id.* at 20-21 (citing AR at 533, 538, 689). Finally, plaintiff relies upon a declaration prepared by Mr. McDonald for the purposes of this lawsuit, which is attached to plaintiff's complaint, in which Mr. McDonald describes CliniComp's contracts "with 7 different VISNs" for the provision of "ICU CIS clinical documentation system[s]." Compl. Ex. A ¶ 28; *see* Pl.'s Mot. at 22. Plaintiff asserts that Mr. McDonald's declaration demonstrates that "other VISNs have awarded contracts to CliniComp for ICU CISs where wave forms are saved to a system of records rather than a GUI." Pl.'s Mot. at 22.

The court may not consider any of the aforementioned extrinsic evidence because, as explained above, the RFQ unambiguously defines the term CPRS. *See, e.g.*, *Banknote*, 365 F.3d at 1353; *Lab. Corp. of Am. v. United States*, 108 Fed. Cl. 549, 566 (2012) ("It is, of course, axiomatic that extrinsic evidence may not be used to import ambiguity into unambiguous contract language." (citing, *e.g.*, *R.B. Wright Constr. Co. v. United States*, 919 F.2d 1569, 1572 (Fed. Cir. 1990), and *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988))). For this reason, the court does not rely upon Mr. McDonald's statements pertaining to

20

CliniComp's alleged contracts with other VISNs.  *See* Compl. Ex. A ¶¶ 26-29. Nor does the court address the parties' disputes as to the appropriateness of considering Dr. Rosendale's declaration filed in CliniComp's agency-level protest, *see* Def.'s Mot. at 12 n.6, or plaintiff's proffered extra-record evidence gleaned from the Internet, *see id.* at 12.

Moreover, plaintiff's proffered extrinsic evidence does not support plaintiff's position, even if the court could properly consider it.  Although it is well-established that evidence of trade practice and custom "'may be useful in interpreting a contract term having an accepted industry meaning different from its ordinary meaning,'" *TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (quoting *Hunt Constr. Grp., Inc. v. United States*, 281 F.3d 1369, 1373 (Fed. Cir. 2002)), none of the extrinsic evidence offered by plaintiff demonstrates that the term CPRS has an accepted industry meaning different than the definition of CPRS set forth in the solicitation.  Most notably, Dr. Rosendale's declaration plainly contradicts plaintiff's view, and supports the solicitation's definition of CPRS, inasmuch as Dr. Rosendale opined that "CPRS is a GUI on Vist[a]."[11]  AR at 913.

Additionally, the Internet sources cited by plaintiff contain no language stating that it is impossible to save data, including viewable wave forms, in a GUI. Furthermore, the cited portions of Picis's quotation merely refer to the terms Vista and CPRS together (*i.e.*, "Vista/CPRS"), *see* AR at 533, 538, 689, and plaintiff offers no explanation as to how the juxtaposition of those terms demonstrates equivalency as to their meaning.  Finally, Mr. McDonald's declaration filed in this litigation says nothing about the specific technical components of CliniComp's alleged contracts with other VISNs, and thus provides no support for plaintiff's assertion that "other VISNs have awarded contracts to CliniComp for ICU CISs where wave forms are saved to a system of records rather than a GUI."  Pl.'s Mot. at 22; *see* Compl. Ex. A ¶¶ 26-29.

---

[11]/  At oral argument, plaintiff acknowledged that Dr. Rosendale "defines CPRS as a user interface to Vista," Tr. at 12, but argued that regardless of whether CPRS is properly defined as a GUI, "you can't save to it," *id.* at 13.  It is worth noting that CliniComp made the same argument in its agency-level protest.  *See* AR at 895 (describing CPRS as a "graphical user interface (GUI) to display Vista patient information" and asserting that "[n]o clinical data [are] actually stored or saved in the CPRS GUI").

In sum, because plaintiff's proffered interpretation of CPRS is contrary to the unambiguous language of the solicitation, plaintiff's arguments concerning the meaning of that term amount to allegations of patent error in the solicitation itself. Any doubt as to the nature of plaintiff's claim is resolved by reference to plaintiff's reply brief, in which plaintiff asserts unequivocally that requirement 5.7.3 was "defect[ive]" because it required offerors to demonstrate their ability to save viewable wave forms in a GUI. *See* Pl.'s Reply at 7, 13.

Nonetheless, even if the court were to perceive an ambiguity within the solicitation's terms, any such ambiguity would be patent, rather than latent. A patent ambiguity in a solicitation "is one that is 'obvious, gross, [or] glaring.'" *NVT Technologies*, 370 F.3d at 1162 (quoting *H & M Moving, Inc. v. United States*, 499 F.2d 660, 671 (Ct. Cl. 1974)); *see also Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 751 (Fed. Cir. 1999) (stating that "[a]n ambiguity is patent if 'so glaring as to raise a duty to inquire'" (quoting *Newsom v. United States*, 676 F.2d 647, 650 (Ct. Cl. 1982))). Such ambiguity is "present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties." *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1381 (Fed. Cir. 2000). When a solicitation contains a patent ambiguity, the offeror has "'a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation'" in a subsequent court action. *Blue & Gold Fleet*, 492 F.3d at 1313 (quoting *Stratos Mobile Networks*, 213 F.3d at 1381).

Here, the provisions of the solicitation upon which plaintiff relies in support of its interpretation of CPRS were clearly apparent to CliniComp before it submitted its quotation. As the government correctly notes, CliniComp submitted inquiries regarding other technical requirements before the September 25, 2013 deadline for the submission of quotations, thus demonstrating that CliniComp had ample time to discern and object to any ambiguity in the RFQ before that date. AR Tabs 2-5; *see* Def.'s Mot. at 11. CliniComp therefore had a duty to seek clarification regarding any such ambiguity prior to the close of bidding. *See Blue & Gold Fleet*, 492 F.3d at 1313 (citing *Stratos Mobile Networks*, 213 F.3d at 1381).

Plaintiff asserts, as an alternative argument, that it did file a timely objection to the RFQ's definition of CPRS by "calling the defect to the VA's attention in [CliniComp's] proposal."  Pl.'s Reply at 7; *see also id.* at 13 (stating that CliniComp "complied with its duty to inquire" because it "brought the defect to the attention of VISN 9").  Plaintiff contends that it was reasonable for it to wait until submitting its quotation before objecting to the terms of the RFQ because of the short time frame for the submission of quotations and because CliniComp "was aware that the VA would be unreceptive to a request for clarification because the VA was rushing to award the contract before the end of the fiscal year."  *Id.* at 7 (citing Compl. Ex. A, and AR at 929); *see also* Tr. at 17-19.  In response, defendant contends that CliniComp was required to object to any error or ambiguity in the RFQ *before* submitting its quotation on September 25, 2013, the closing date for receipt of proposals, and that CliniComp's failure in that regard is fatal to its challenge to the solicitation's definition of CPRS.  *See* Def.'s Reply at 1-2, 6 & n.2; Tr. at 26-27.

The court agrees with defendant that CliniComp's response to requirement 5.7.3 in its quotation did not constitute a timely objection under *Blue & Gold Fleet*.  As noted *supra*, the Federal Circuit in *Blue & Gold Fleet* held that a protester must raise an objection to a solicitation containing a patent error or ambiguity "prior to the close of the bidding process" before raising the same objection subsequently in the Court of Federal Claims.  492 F.3d at 1315.  Although, as far as the court is able to discern, the Federal Circuit has not expressly addressed the timeliness of objections contained within an offeror's proposal itself, this court's precedent appears to support the view that such objections are untimely.[12]  *See Linc*, 96 Fed. Cl. at 713 (holding that plaintiff waived its challenges to the Army's price evaluation, which amounted to allegations of patent error or ambiguity in the

_____

[12]/  Indeed, this court's opinion in *Blue & Gold Fleet*, which was affirmed by the Federal Circuit, found that the protester had missed its chance to protest the terms of the solicitation in that case because it had failed to challenge such terms before submitting its proposal.  *See Blue & Gold Fleet*, 492 F.3d at 1312 (noting that "[t]he Court of Federal Claims found that Blue & Gold 'missed its chance to protest' based on the Service Contract Act because Blue & Gold (1) was attempting to challenge the terms of the solicitation, rather than the evaluation process, and (2) did not raise the challenge prior to the submission of the proposals" (quoting *Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487, 513-14 (2006))).

solicitation, by "fail[ing] to raise these objections with the Army prior to submitting its proposal") (citations omitted); *Allied Materials & Equip. Co. v. United States*, 81 Fed. Cl. 448, 459 (2008) (stating that *Blue & Gold Fleet* "has been consistently interpreted as standing for the proposition that '[t]he proper time to challenge the provisions of a prospectus is before bids are required to be submitted'" (quoting *Frazier v. United States*, 79 Fed. Cl. 148, 177 (2007))); *Benchmade Knife Co. v. United States*, 79 Fed. Cl. 731, 733 (2007) (holding that plaintiff's "small business set-aside and bundling allegations are untimely, and should have been raised before proposals were submitted") (citation omitted); *Masai Techs. Corp. v. United States*, 79 Fed. Cl. 433, 444 (2007) ("To the extent [the protester] believed that the citizenship requirement [in the solicitation] was too stringent or otherwise improper, [the protester] should have raised its objection with the Army prior to submitting its proposal.") (citation omitted).

Moreover, even if CliniComp were correct that its quotation could serve as a timely challenge to the terms of the RFQ for purposes of satisfying the *Blue & Gold Fleet* waiver rule, nothing in CliniComp's quotation could reasonably be construed as asserting the existence of error or ambiguity with respect to the meaning of the term CPRS. CliniComp stated in its response to requirement 5.7.3 that wave form data "can be saved permanently on the CIS" but that an additional, subsequent quotation would be required "[i]f the VA wishes to redundantly export waveform data to CPRS." AR at 527.26. Conspicuously absent from CliniComp's response was any indication that CliniComp disagreed with or was confused by the RFQ's requirement that "wave forms are to be saved in CPRS as part of the patient record." *Id.* at 108. Rather than object to the requirement itself, CliniComp stated that its compliance with the requirement would necessitate an additional quotation.

Thus, CliniComp's assertion that its quotation served as a timely objection to the terms of the RFQ is without merit. Having failed to object to the terms of the RFQ in a timely manner, CliniComp has waived its right to do so before this court. *See Blue & Gold Fleet*, 492 F.3d at 1313.

## 2.   The VA Engaged in Unequal Treatment in Rating Picis's Quotation as Technically Acceptable

Plaintiff's remaining challenge to the VA's technical evaluation is that the agency unlawfully engaged in disparate treatment by "relaxing the requirement that wave forms are to be saved to the CPRS GUI" when evaluating the quotation submitted by Picis.  Compl. ¶ 62; *see id.* ¶¶ 58-63 (Count V); Pl.'s Mot. at 31-34; Pl.'s Reply at 13-14.  Plaintiff contends that the VA, by evaluating quotations unevenly, violated its duty to treat all offerors fairly and equally and therefore acted irrationally and contrary to law.  *See* Pl.'s Mot at 31-34 (citing *Hunt Bldg. Co., Ltd. v. United States*, 61 Fed. Cl. 243, 274 (2004) (*Hunt Building*)); Pl.'s Reply at 13-14 (citing *L-3 Commc'ns EOTech, Inc. v. United States*, 83 Fed. Cl. 643, 651-53 (2008) (*L-3 Communications*)).  This allegation, unlike CliniComp's challenge to the VA's alleged interpretation of the term CPRS, is properly characterized as a challenge to the VA's evaluation of proposals rather than to the terms of the RFQ itself, and therefore is not barred by *Blue & Gold Fleet*.

As previously noted, CliniComp stated in its response to requirement 5.7.3 that wave form data "can be saved permanently on the CIS" but that an additional, subsequent quotation would be required "[i]f the VA wishes to redundantly export waveform data to CPRS."  AR at 527.26.  In contrast, Picis stated in response to the same requirement that

> [w]aveform images and other digital images like outside labs, consents, etc[.] can be included in the Picis workflow through an inbound HL7 documentation interface.  This interface allows documents and document images to be directly launched from Picis Critical Care Manager in their originating application (.doc file in Word, .pdf files in Adobe, etc[.]).

*Id.* at 590.

CliniComp argues that Picis neither stated its intention, nor demonstrated its ability, to comply with requirement 5.7.3 because Picis did not expressly commit to saving wave form data in CPRS.  *See* Pl.'s Mot. at 32-34; Pl.'s Reply at 14.  In view of this alleged deficiency in Picis's quotation, plaintiff contends that the agency unlawfully engaged in disparate treatment by awarding the disputed contract to Picis while rejecting CliniComp's quotation as technically unacceptable.

25

The government disagrees, arguing that there is no evidence in the record of any unequal treatment of CliniComp's and Picis's quotations vis-à-vis requirement 5.7.3.  *See* Def.'s Mot. at 15 n.7, 16.  Defendant asserts that CliniComp's and Picis's quotations were fundamentally distinct inasmuch as "CliniComp's proposal, and not Picis's, states that it would have to submit an additional quotation to satisfy a mandatory requirement."[13]  *Id.* at 16.

As this court and the Government Accountability Office (GAO) have repeatedly held, an "agency's failure to follow the terms of its own Solicitation and selection of an offeror based upon different requirements than those imposed upon the only other offeror are quintessential examples of conduct which lacks a rational basis."  *Hunt Building*, 61 Fed. Cl. at 273 (citation omitted); *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 490 (2013) ("It is well-established that a 'contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria.'" (quoting *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 383 (2003))); *L-3 Communications*, 83 Fed. Cl. at 653 ("Waiver of a mandatory requirement of the solicitation for the benefit of only one offeror invalidates a procurement decision." (citing *Alfa Laval*, 175 F.3d at 1367-68, and *Beta Analytics Int'l, Inc. v. United States*, 44 Fed. Cl. 131, 138 (1999))); *Sperry Marine, Inc.*, B-227106, B-227106.2, 87-2 CPD ¶ 241, 1987 WL 102805, at *6 (Comp. Gen. Sept. 14, 1987) (sustaining protest because the Navy relaxed two mandatory performance requirements for one offeror only).  Such uneven treatment "goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion."  *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 207 (citations omitted), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004); *see also* 41 U.S.C. § 3301(a) (requiring "full and open competition through the use of competitive procedures"); *TLT Constr. Corp. v. United States*, 50 Fed. Cl. 212, 216 (2001) ("A fundamental principle of government procurement

---

[13]/  In its reply brief, plaintiff erroneously suggests that the government failed to contest plaintiff's allegations of unequal treatment and therefore "conceded" unequal treatment.  Pl.'s Reply at 29.  To the contrary, as demonstrated by the above-cited portions of defendant's opening brief, the government *did* respond to plaintiff's allegations and arguments concerning unequal treatment.

is that [the agency must] treat all offerors equally and consistently apply the evaluation factors listed in the solicitation.") (citation omitted).

The record of this procurement supports plaintiff's assertion that the VA held CliniComp's quotation to different, and more exacting, technical standards than Picis's quotation.  The RFQ at issue in this case required offerors to "adequately address all technical requirements contained in the [Statement of Work] and in the Attachments provided."  AR at 65.  Requirement 5.7.3 stated that "viewable wave forms are to be saved in CPRS as part of the patient record."  *Id.* at 108.  Picis responded to that requirement by stating that wave forms "can be included in the Picis workflow through an inbound HL7 documentation interface" which would allow "documents and document images to be directly launched from Picis Critical Care Manager in their originating application."  *Id.* at 590.  Picis's response did not even mention CPRS, let alone commit to saving viewable wave forms in CPRS.  Thus, Picis's response, on its face, does not appear to satisfy requirement 5.7.3.

When pressed at oral argument to explain how Picis committed to saving viewable wave forms "in CPRS as part of the patient record," the government referred to the portion of Picis's response stating that "documents and document images" could be "directly launched from Picis Critical Care Manager in their originating application" using an "inbound HL7 documentation interface."  AR at 590; *see* Tr. at 30, 33.  The government surmised that "launch[ing]" "documents and document images" "from Picis Critical Care Manager" using an "inbound HL7 documentation interface" is equivalent to "sav[ing]" viewable wave forms "in CPRS as part of the patient record."  Tr. at 33, 40 (asserting that "displayed and saved are the same thing").  Defendant also referred the court to two diagrams in Picis's quotation which allegedly demonstrate that Picis proposed to save viewable wave forms in CPRS.  *Id.* at 33-34 (citing AR at 689-90).

The government's convoluted attempt to demonstrate that Picis committed to saving viewable wave forms "in CPRS" is simply not borne out by the record.  As an initial matter, according to the terms of Picis's quotation, an "inbound HL7 documentation interface" can only refer to an interface *to Picis* – not to Vista or CPRS.  In a section of its quotation titled "Picis Statement of Implementation Services," Picis described the interfaces it offered to provide as part of its quotation.  AR at 675.  With respect to each of the "inbound" interfaces listed

in Picis's quotation, Picis – *not* Vista or CPRS – is described as the "Receiving System."  *Id.*  Thus, when examined in relation to this other portion of Picis's proposal, defendant's assertion that Picis committed to saving viewable wave forms in CPRS using an "inbound HL7 documentation interface" makes no sense.

Nor is the court persuaded by the government's reliance upon certain diagrams contained in Picis's quotation, neither of which indicate that Picis proposed to save viewable wave forms in CPRS.  *See* AR at 689-90.  Indeed, one of those diagrams appears to contradict defendant's position inasmuch as it depicts information as flowing *from* "Vist[a]/CPRS" *to* the "Picis Workstation."  *Id.* at 690.

In sum, defendant has provided no record support for the VA's conclusion that Picis's quotation satisfied the requirement to save viewable wave forms in CPRS.  In this context, the court considers the VA's technical evaluation of Picis's quotation, and the consequent award to Picis, to constitute a relaxation, solely for the benefit of one offeror, of the requirement that "viewable wave forms are to be saved in CPRS as part of the patient record."  AR at 108.  Such unequal treatment is fundamentally arbitrary and capricious, and violates the full and open competition mandated by CICA in 41 U.S.C. § 3301(a).[14]

---

[14]/  The court notes, parenthetically, that the government's attempts to distinguish *Hunt Building* and *L-3 Communications* are unpersuasive.  In both cases, the government, following the submission of initial proposals and the establishment of a competitive range, entered into discussions with offerors during which it relaxed material solicitation requirements for the successful offeror but not for the protester.  As a result, the protester's proposal in each case was held to more stringent requirements than the successful offeror's.  In such circumstances, this court found the government to have unlawfully engaged in unequal treatment.  *See L-3 Communications*, 83 Fed. Cl. at 652 (finding error in the Army's decision to allow the successful offeror's modified proposal to proceed to award without being subjected to "Endurance-Live Fire Essential Criteria testing" to which the protester's proposal had been subjected); *Hunt Building*, 61 Fed. Cl. at 274 (finding error in the Air Force's decision to modify a solicitation requirement for the successful offeror after twice rejecting the protester's request for the same modification).  Defendant argues that, unlike in *Hunt Building* and *L-3 Communications*, "the same RFQ was before CliniComp and Picis," Def.'s Mot. at 15 n.7, and the agency "did not waive a mandatory requirement" but rather "abided by a mandatory RFQ requirement" by rating CliniComp's proposal as technically unacceptable, Def.'s Reply at 8.  Contrary to defendant's assertions, there is no meaningful difference between modifying the terms of a solicitation for (continued . . .)

The court is mindful of the substantial discretion afforded to agencies when conducting negotiated procurements such as this, as well as the heightened deference which is normally afforded to technical judgments that are within a procuring agency's area of expertise.  *See supra* Part II.B. Nevertheless, an agency's discretion in this context is not boundless, and the court need not defer to a wholly arbitrary procurement decision.  At the very least, the source selection authority (SSA) must provide a "coherent and reasonable explanation" for its conclusions, even if those conclusions are technical in nature.  *Axiom*, 564 F.3d at 1381 (citation and internal quotation marks omitted); *see Weston Solutions, Inc. v. United States*, 95 Fed. Cl. 311, 328 (2010) (concluding that the agency acted irrationally by "fail[ing] to articulate a coherent and reasonable explanation" for its rating of plaintiff's proposal), *aff'd*, 440 F. App'x 926 (Fed. Cir. 2011); *Info. Sciences Corp. v. United States*, 73 Fed. Cl. 70, 121 (2006) (noting that the FAR "requires evidence of the [SSA's] exercise of independent judgment") (citation omitted), *aff'd on reconsideration in part*, 75 Fed. Cl. 406 (Fed. Cl. 2007).

Here, the record is bereft of any explanation for the VA's rating of Picis's quotation as technically acceptable.  The only record evidence pertaining to the agency's technical evaluation of Picis's quotation is a series of "Technical Evaluation Rating Sheets" on which the VA's evaluators marked a check box labeled "ACCEPTABLE" and circled the word "Pass" under each of the five technical evaluation criteria.  AR Tab 16.  At oral argument, government counsel confirmed that there is no record evidence of the agency setting forth the basis for its "Pass" rating, "[o]ther than [the agency's] checking off a box."  Tr. at 29.

The agency's failure to articulate any basis for its disparate treatment of CliniComp's and Picis's quotations renders this procurement fundamentally irrational and invalid.  While the APA standard does not charge the court with

---

the benefit of only one offeror and evaluating offerors differently under the same solicitation terms.  Moreover, defendant's myopic argument focuses exclusively on CliniComp's allegedly non-compliant response to requirement 5.7.3, and ignores the fact that Picis's response to that same requirement was functionally equivalent yet was rated more favorably by the VA's evaluators.

holding the VA to a mistake-free procurement, the court simply cannot discern any "coherent and reasonable explanation" of the agency's exercise of discretion where, as here, the record contains no explanation whatsoever.  *Axiom*, 564 F.3d at 1381; *see Weston Solutions*, 95 Fed. Cl. at 328.

### B.     Plaintiff's Challenge to a "Competitive Range of One" (Count II) and to the VA's "Discussions" (Counts III and IV)

CliniComp's remaining allegations raise issues concerning the level of scrutiny to be applied in reviewing the VA's technical evaluation of proposals as well as the adequacy of the VA's exchanges with CliniComp following the receipt of quotations and before award.  In Count II, plaintiff asserts that the VA's rejection of CliniComp's quotation as technically unacceptable must be subjected to "close scrutiny" because it resulted in a "competitive range" consisting of one offeror.  Compl. ¶¶ 38, 40-41; *see* Pl.'s Mot. at 23-26; Pl.'s Reply at 16-17. Plaintiff contends that this procurement "cannot withstand close scrutiny" because the VA "abruptly and prematurely terminate[d] discussions" with CliniComp based upon the agency's alleged "rush to enter into a contract before the end of the federal fiscal year."  Pl.'s Mot. at 25-26.

In Count III, plaintiff alleges that the VA failed to engage in "meaningful discussions" with CliniComp because it did not tell CliniComp, prior to selecting Picis for award, that the agency considered CliniComp's quotation to have taken exception to requirement 5.7.3.  Compl. ¶¶ 42-49; *see also* Pl.'s Mot. at 26-29; Pl.'s Reply at 24-29.  In plaintiff's view, "[i]f the VISN 9 Contracting Officer had told CliniComp of [the agency's] actual concerns, CliniComp would have removed any language in its proposal that formed the basis for [the agency's] perception that CliniComp had taken exception to [requirement] 5.7.3."  Compl. ¶ 48; *see also* Pl.'s Mot. at 28 ("[T]here would be no protest today if [the VA] had complied with its duty to engage in meaningful discussions by informing CliniComp of the evaluators' actual concerns.").

Finally, in Count IV, plaintiff reiterates its contention that the VA abused its discretion by "abruptly and prematurely terminat[ing] discussions" with CliniComp based upon the agency's alleged "rush to enter into a contract before

the end of the federal fiscal year."  Compl. ¶ 57; *see also* Pl.'s Mot. at 29-30; Pl.'s Reply at 20-21, 28-29.

An analysis of plaintiff's allegations concerning the VA's alleged establishment of a "competitive range" of one offeror, as well as the adequacy of the agency's alleged "discussions" with CliniComp, requires an understanding of the operation of FAR 15.306, which establishes a comprehensive scheme governing procuring agencies' competitive range determinations and pre-award exchanges with offerors.

Pursuant to FAR 15.306(a), when an award is to be made "without discussions" between the parties, the government "may" conduct limited exchanges, or "clarifications," to "clarify certain aspects of proposals . . . or to resolve minor or clerical errors."  FAR 15.306(a)(2).  FAR 15.306(a) thus describes the decision to engage in clarifications as discretionary.  *See ITAC*, 316 F.3d at 1318 (noting that the agency may choose to engage in clarifications "with one or more offerors") (citations omitted); *BCPeabody Constr. Servs., Inc. v. United States*, 112 Fed. Cl. 502, 510 (2013) ("For negotiated procurements, clarifications are to be obtained at the discretion of the contracting officer."), *appeal dismissed per stipulation*, No. 2014-5024, 2014 WL 1386691 (Fed. Cir. Mar. 27, 2014); *DynCorp Int'l LLC v. United States*, 76 Fed. Cl. 528, 540 (2007) ("[A] procuring agency has the discretion to decline to enter into clarifications with an offeror, even if the agency has engaged in clarifications with another offeror.") (citations omitted); *Gulf Grp. Inc. v. United States*, 61 Fed. Cl. 338, 361 (2004) ("Nor does the FAR ever require clarifications to be requested by agency officials." (citing FAR 15.306(a))).

FAR 15.306(b) addresses exchanges aimed at determining whether an offeror should be included in the competitive range of proposals.  Such "communications" may be conducted "to enhance Government understanding of proposals . . . or [to] facilitate the Government's evaluation process . . . . [f]or the purpose of establishing the competitive range."  FAR 15.306(b)(2).  FAR 15.306(b)(3) emphasizes, however, that such communications "shall not provide an opportunity for the offeror to revise its proposal."  Additionally, such communications are not applicable where no competitive range is established.  FAR 15.306(b) (stating that communications are exchanges "leading to

establishment of the competitive range" which only occur "[i]f a competitive range is to be established").

FAR 15.306(c) discusses the competitive range determination itself, and provides, in pertinent part, that

> [a]gencies shall evaluate all proposals in accordance with 15.305(a), and, *if discussions are to be conducted, establish the competitive range*.  Based on the ratings of each proposal against all evaluation criteria, the contracting officer shall establish a competitive range comprised of all of the most highly rated proposals . . . .

FAR 15.306(c)(1) (emphasis added).  FAR 15.306(c) thus makes it clear that the government will establish a competitive range only in those instances where it intends to engage in "discussions" with an offeror during which the offeror will be afforded an opportunity to revise its proposal.  *See Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 729 (2008) ("A contracting agency is required to establish a competitive range if it intends to conduct discussions with offerors." (citing FAR 15.306(c)(1))); *DynCorp*, 76 Fed. Cl. at 538 ("When an agency decides not to hold discussions, a competitive range is neither required nor permitted by FAR 15.306."); *Firearms Training Sys., Inc. v. United States*, 41 Fed. Cl. 743, 747-48 (1998) (noting that "FAR 15.306(a) anticipates that where, as here, the solicitation reflects an intent to make an award without discussions, the contracting officer will make a competitive range determination only if the contracting officer later determines that commencing such discussions and allowing proposal revisions would be efficient").

FAR 15.306(d) sets forth the rules for "[e]xchanges with offerors after establishment of the competitive range."  The hallmark of such exchanges, called "discussions," is that they "are undertaken with the intent of allowing the offeror to revise its proposal."  FAR 15.306(d); *see ITAC*, 316 F.3d at 1322 (noting that FAR 15.306 "contemplates discussions as occurring in the context of negotiations" during which "bidders have the opportunity to revise their proposals" (citing FAR 15.306(d)); *DynCorp*, 76 Fed. Cl. at 541 (noting the "long-standing GAO rule that 'the acid test for deciding whether discussions have been held is whether it can be

32

said that an offeror was provided the opportunity to revise or modify its proposal'" (quoting *Priority One Servs., Inc.*, B-288836, B-288836.2, 2002 CPD ¶ 79, 2001 WL 1872433, at *4 (Comp. Gen. Dec. 17, 2001))).

The decision whether to conduct discussions is generally left to the discretion of the contracting officer. *E.g.*, *Atl. Diving Supply, Inc. v. United States*, 107 Fed. Cl. 244, 263-64 (2012) (*Atlantic Diving*) ("[T]his court has recognized that 'both the decision to conduct discussions and the scope of any discussions are left to the judgment of the contracting officer.'" (quoting *Biospherics, Inc. v. United States*, 48 Fed. Cl. 1, 9 (2000))).  This is particularly so where offerors are on notice that award may be made without discussions.  *E.g.*, *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1328 (Fed. Cir. 2011) (holding that an RFQ "unambiguously g[ave] the Contracting Officer the discretion over whether to engage in discussions" where the RFQ provided that the government intended to make award on the basis of initial quotations "without the use of discussions"); *Atlantic Diving*, 107 Fed. Cl. at 263 (stating that the protester was "on notice, based on the clear terms of the Solicitation, that corrective discussions were not guaranteed, and that its proposal would either stand or fall on its own, as written"); *DynCorp*, 76 Fed. Cl. at 539-40 (same); *see also* 41 U.S.C. § 3703(a)(2) (2012) (stating that a procuring agency may award a contract "without discussions with the offerors . . . if . . . the solicitation included a statement that proposals are intended to be evaluated, and award made, without discussions unless discussions are determined to be necessary"); FAR 15.306(a)(3) ("Award may be made without discussions if the solicitation states that the Government intends to evaluate proposals and make award without discussions.").  In such circumstances, if the government later "determines it is necessary to conduct discussions, the rationale for doing so shall be documented in the contract file."  FAR 15.306(a)(3).

Here, the record demonstrates that the VA did not intend to allow offerors to revise their proposals through "discussions" pursuant to FAR 15.306(d).  Consistent with FAR 15.306(a)(3), the RFQ informed offerors that the VA "intends to evaluate offers and award a contract without discussions with offerors," and therefore "the offeror's initial offer should contain the offeror's best terms from a price and technical standpoint."  AR at 63; *see also id.* at 929.  "Incorporation of the substance of this notice into solicitations has been held to put offerors on notice that they should not expect to have an opportunity to revise their

offers."  John Cibinic, Jr. et al., *Formation of Government Contracts* 869 (4th ed. 2011) (citing *Robotic Sys. Tech.*, B-278195, B-278195.2, 98-1 CPD ¶ 20, 1998 WL 14951 (Comp. Gen. Jan. 7, 1998)).  Thus, CliniComp was on notice, based on the clear terms of the RFQ, that the VA intended to award without discussions and that CliniComp would not be afforded an opportunity to revise its quotation unless the VA later determined that discussions were necessary.

Plaintiff argues that although discussions were not contemplated at the outset of this procurement, "it is beyond contention that the Contracting Officer entered into discussions" with CliniComp.  Pl.'s Reply at 24; *see also* Tr. at 22 (stating that "discussions here were not required, but they were voluntarily entered into").  In support of its argument, plaintiff refers to a memorandum prepared by Mr. Hendricks in connection with CliniComp's agency-level protest in which Mr. Hendricks stated, in pertinent part:

> [CliniComp] knew exactly what our concerns were, which was that they were not offering a current solution or compliance.  My explanation on how they failed to meet the technical requirement was expressed in my own words, and not that of a technical evaluator.
>
> . . . .
>
> Under GSA rules I was not required to engage in any discussions or clarification.  I did however do just that, and the response [CliniComp] provided seemed to further reinforce the fact [that] they were not able to offer compliance for that requirement until negotiations for agreeable specifications were conducted and an additional quote was then provided.

AR at 916; *see* Pl.'s Reply at 24-25.  Plaintiff contends that the above-quoted language contains Mr. Hendricks' "admission" that he entered into discussions with CliniComp.  Pl.'s Reply at 25.  Additionally, at oral argument, plaintiff referred the court to alleged evidence of "discussions" in e-mail correspondence between Mr. Hendricks and Mr. McDonald on September 26, 2013, AR at 938-45,

as well as Mr. McDonald's description of such correspondence in his declaration submitted in connection with CliniComp's agency-level protest, *id.* at 909-10; *see* Tr. at 42.

Upon review of the record, the court is not persuaded that the VA ever entered into discussions with CliniComp, as that term is defined by FAR 15.306(d). Rather, it is clear that the agency engaged only in clarifications pursuant to FAR 15.306(a). In his e-mail correspondence with Mr. McDonald on September 26, 2013, Mr. Hendricks stated that he was seeking only to obtain further information regarding CliniComp's response to requirement 5.7.3. AR at 939 ("VISN 9 doesn't understand why [CliniComp] would provide a quotation for something that is a mandatory requirement. Shouldn't it just be included in the base price?"); *see also id.* at 933 (describing the additional information provided by Mr. McDonald via e-mail on September 26, 2013 as "further clarification"), 938 (expressing gratitude for Mr. McDonald's "clarification" of CliniComp's response to requirement 5.7.3). Notwithstanding Mr. Hendricks' imprecise description of his pre-award exchanges with Mr. McDonald as "discussions or clarification," *id.* at 916, plaintiff has presented no evidence that the contracting officer ever afforded CliniComp an opportunity to revise its quotation through discussions, *see ITAC*, 316 F.3d at 1322-23 (holding that exchanges between the Air Force and the prevailing bidder were "clarifications," not "discussions," because the prevailing bidder was not given an opportunity to revise its proposal). Accordingly, plaintiff has failed to demonstrate that the government engaged in discussions pursuant to FAR 15.306(d).

Because the VA never conducted discussions, it was neither required nor permitted to make a competitive range determination. *See, e.g.*, *Femme Comp*, 83 Fed. Cl. at 729; *DynCorp*, 76 Fed. Cl. at 538. Nor has plaintiff offered any evidence that the agency made such a determination. Therefore, plaintiff's allegations of error with respect to the VA's alleged discussions and competitive range determination must fail.

## V. Success on the Merits

Based upon the VA's disparate treatment of CliniComp and Picis in the agency's technical evaluation of proposals, the court finds that the agency's award

decision was irrational and fundamentally flawed.  The agency's errors are too significant to disregard as harmless or *de minimis*.

The parties nevertheless dispute whether CliniComp was prejudiced by the procurement errors committed by the VA.  In that regard, as noted *supra*, the question is not whether CliniComp has proved that it would have received the award but for these procurement errors.  *See, e.g.*, *Data General*, 78 F.3d at 1562. Rather, the question is whether CliniComp has shown that it had a substantial chance of receiving the contract award but for the VA's disparate treatment of CliniComp and Picis.  *See id.*

The court finds that CliniComp has made the required showing of prejudice. As previously noted, CliniComp offered the lowest price by a considerable margin. If the VA had evaluated CliniComp's response to requirement 5.7.3 in the same manner as it evaluated Picis's response, it could easily have found both offerors' quotations to be technically acceptable, and CliniComp as the lowest price bidder would therefore have had a substantial chance of receiving award.  Alternatively, the agency, had it evaluated proposals fairly, might have concluded that neither CliniComp nor Picis satisfied requirement 5.7.3 in their initial proposals, and might have opted to elicit revised quotations through discussions.  In that alternative scenario, CliniComp would likewise have had a substantial chance of receiving award by altering its quotation to conform to the agency's requirements.

In sum, the court is satisfied that CliniComp had a substantial chance of award, and was prejudiced by the procurement errors discussed in this opinion. CliniComp has therefore succeeded on the merits of its bid protest.  Because CliniComp has prevailed on the merits, the court turns to the factors governing the award of injunctive relief.

## VI.   Injunctive Relief

As the Federal Circuit has held,

> [i]n deciding whether a permanent injunction should issue, a court considers:  (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2)

> whether the plaintiff will suffer irreparable harm if the
> court withholds injunctive relief; (3) whether the balance
> of hardships to the respective parties favors the grant of
> injunctive relief; and (4) whether it is in the public
> interest to grant injunctive relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citation omitted).  Here, plaintiff has succeeded on the merits.  Thus, the first injunctive relief factor favors permanently enjoining the VA's contract award to Picis.

With regard to an assessment of the factor of irreparable harm, the relevant inquiry is whether CliniComp has an adequate remedy in the absence of injunctive relief.  *See, e.g.*, *EREH Phase I LLC v. United States*, 95 Fed. Cl. 108, 123 (2010) (citing *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1327 (Fed. Cir. 2008)).  This court, in many cases, has found that the loss of an opportunity to fairly compete for a contract constitutes irreparable harm because it is not compensable by bid preparation costs, which is the only other available relief to a disappointed bidder. *See, e.g.*, *Furniture by Thurston v. United States*, 103 Fed. Cl. 505, 520 (2012) ("The court has repeatedly held that 'the loss of potential profits' from a government contract constitutes irreparable harm." (quoting *BayFirst Solutions, LLC v. United States*, 102 Fed. Cl. 677, 696 (2012))); *ViroMed Labs., Inc. v. United States*, 87 Fed. Cl. 493, 503 (2009) (holding that "[s]tanding alone, the loss of an opportunity to fairly compete on future government contracts constitutes irreparable harm" because "[a]n action at law only allows recovery of bid preparation costs in a suit for damages, but not loss of anticipated profits") (citations and internal quotation marks omitted); *Hosp. Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005) ("Here, absent injunctive relief, [the protester] will lose the opportunity to earn the profit it would have made under this contract.  Such loss of profit, stemming from a lost opportunity to compete for a contract on a level playing field[,] has been found sufficient to constitute irreparable harm.") (citations omitted).  The court considers the loss of potential profits from a large government contract award, in this instance, to constitute irreparable harm.  Thus, plaintiff has satisfied the second criterion for receiving a permanent injunction.

With respect to the third factor, this court tends to weigh the balance of hardships factor in favor of the protestor who has succeeded on the merits, unless specific facts counsel otherwise. *See, e.g., BayFirst Solutions*, 102 Fed. Cl. at 696 (citing *Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 110-11 (2004)). Here, the government agreed, at the outset of this case, to suspend performance of the disputed contract pending the resolution of CliniComp's protest. *See* Order of March 10, 2014, at 2. The government has not argued, or shown, that an additional delay in performance would constitute a hardship for the VA. Thus, the balance of hardships tips in favor of CliniComp, if it were not permitted to fairly compete for the contract at issue, when compared to any hardships the VA might face.

Finally, as to the public interest, the court views this factor as unquestionably favoring injunctive relief in this case. The VA's technical evaluation, and thus its award decision, reflected the agency's unequal treatment of offerors and therefore lacked a rational basis. Furthermore, CliniComp provided the quotation with the lowest price, yet the VA rejected those cost savings. Such award decisions destroy the public trust in government contracting and deprive the government of the benefits of full and open competition. *See, e.g., Metcalf Constr. Co. v. United States*, 53 Fed. Cl. 617, 645 (2002) (noting the twin goals of preserving "public confidence and competition in the federal procurement process") (citation omitted). Because all four factors favor injunctive relief in this protest, the court concludes that a permanent injunction must issue.

## VII.  Nature of the Permanent Injunction

The award of Contract No. GS-35F-0589X to Picis must be set aside. The court does not set any restrictions on the VA's options for the re-solicitation of proposals, or for the re-evaluation of proposals received under RFQ No. VA249-13-Q-1015. The agency also has the discretion to not re-procure these services.

The court notes, however, that any technical re-evaluation of proposals under RFQ No. VA249-13-Q-1015 must be conducted in accordance with the standards referenced in this opinion and must correct the errors noted in this opinion by providing a detailed explanation as to whether proposals adequately responded to each of the technical requirements set forth in the RFQ, including

requirement 5.7.3.  Upon re-evaluation, the VA is permitted, but not required, by the solicitation to enter into discussions with offerors.  *See* AR at 63.

## VIII.  Plaintiff's Motion to Supplement the Record

Finally, the court turns its attention to a dispute between the parties as to whether Mr. McDonald's declaration, prepared for the purposes of this litigation and filed as Exhibit A to plaintiff's complaint (hereinafter, Exhibit A), may be utilized to supplement the AR in this bid protest.

As a general rule, the "focal point for judicial review [of the challenged agency decision] should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  In *Axiom*, the Federal Circuit identified the acceptable circumstances under which the administrative record may be supplemented in a bid protest.  564 F.3d at 1379-81.  The *Axiom* panel adopted a restrictive standard for supplementation of the record in a bid protest, stating that "supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'"  *Id.* at 1380 (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000)).  The purpose of this restrictive standard, the court noted, is "to guard against courts using new evidence to 'convert the arbitrary and capricious standard into effectively de novo review.'"  *Id.* (quoting *Murakami*, 46 Fed. Cl. at 735).

The court notes, at the outset, that Exhibit A is identical in certain respects to Mr. McDonald's declaration filed in connection with CliniComp's agency-level protest, which is already part of the AR.  *See* AR at 908-11.  For instance, Mr. McDonald's description in Exhibit A of his exchanges with Mr. Hendricks from September 26, 2013 through October 3, 2013 is largely duplicative of material in his earlier declaration.  *Compare id.* at 909-11, *with* Compl. Ex. A ¶¶ 10-11, 13-17.  Such duplicative material adds nothing to the AR, and therefore its omission would not "'frustrate effective judicial review.'"  *Axiom*, 564 F.3d at 1381 (quoting *Pitts*, 411 U.S. at 142-43); *see NCL Logistics Co. v. United States*, 109 Fed. Cl. 596, 616 (2012) (holding that the omission of duplicative material from the existing record would not preclude meaningful review) (citations omitted), *appeal dismissed per*

*stipulation*, No. 2013-5064 (Fed. Cir. Sept. 27, 2013); *PlanetSpace, Inc. v. United States*, 90 Fed. Cl. 1, 9 (2009) (same).

The non-duplicative material in Exhibit A pertains to: (1) CliniComp's alleged contracts with other VISNs, Compl. Ex. A ¶¶ 26-29; (2) an alleged conversation between Mr. McDonald and Mr. Hendricks on September 17, 2013 which allegedly revealed the VA's haste to award a contract before the end of the federal fiscal year, *id.* ¶¶ 5-6; and (3) Mr. McDonald's assertion that had Mr. Hendricks revealed during "discussions" that the VA considered CliniComp's proposal to be technically unacceptable, CliniComp "would have removed any language in its proposal that formed the basis" for the agency's conclusion, *id.* ¶ 20.[15] As noted *supra*, plaintiff relies upon the first category of new information to support its understanding of the term CPRS in requirement 5.7.3. Yet, as previously explained, the court may not refer to such information because the RFQ is unambiguous as to the meaning of the term CPRS.

The second and third categories of new information are relied upon by plaintiff to support its allegations concerning the VA's alleged discussions and competitive range determination. *See* Pl.'s Mot. at 25-27; Pl.'s Reply at 17-18, 23-24. As set forth *supra*, however, the agency was not required to, and did not, engage in discussions or make a competitive range determination. Thus, evidence of the VA's alleged "rush" to award a contract, as well as Mr. McDonald's opinion as to how CliniComp might have altered its quotation but for certain perceived defects in the agency's "discussions," have no relevance to this bid protest and are not necessary for effective judicial review.

Simply put, the court does not need Exhibit A to conduct a meaningful review of this procurement. Accordingly, Exhibit A is not an acceptable supplement to the AR in this case and plaintiff's motion to supplement must be denied.

## CONCLUSION

---

[15]/ The court notes an apparent typographical error in Exhibit A, which contains two paragraphs numbered "20." *See* Compl. Ex. A at 5-6. The paragraph cited above is the first such paragraph numbered "20."

Accordingly, it is hereby **ORDERED** that

(1) Plaintiff's Motion to Supplement and Complete the Administrative Record, filed March 18, 2014, is **DENIED**;

(2) Plaintiff's Motion for Judgment on the Administrative Record, filed April 2, 2014, is **GRANTED**;

(3) Defendant's Cross-Motion for Judgment on the Administrative Record, filed April 25, 2014, is **DENIED**;

(4) The Clerk's Office is directed to **ENTER** final judgment in favor of plaintiff, as follows:

> The United States, by and through the Department of Veterans Affairs, is hereby **PERMANENTLY RESTRAINED AND ENJOINED** from obtaining performance from Picis, Inc. on **Contract No. GS-35F-0589X** awarded on October 2, 2013;

(5) On or before **July 31, 2014**, counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary or confidential marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter;

(6) On or before **July 31, 2014**, defendant shall **FILE**, as a separate **UNSEALED** document on CD-ROM, a redacted version of the administrative record filed March 12, 2014, as well as redacted versions of the supplements to the administrative record filed on March 21, 2014 and April 18, 2014, so as to establish a proper public record of this protest;

(7) On or before **July 31, 2014**, defendant shall **FILE**, as a separate **UNSEALED** document, a redacted version of Defendant's Opposition to Plaintiff's Motion to Supplement the Administrative

Record, filed March 28, 2014, so as to establish a proper public record of this protest; and

(8)     Each party shall bear its own costs.


<u>/s/Lynn J. Bush</u>
LYNN J. BUSH
Senior Judge